**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DR. DANIEL C. SHELTON, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. _____ |
| | : | |
| | : | **Jury Trial Demanded** |
| DONALD PATTON, NAVEED BAQIR, | : | |
| YUN FEI LOU, and ALETHEA SMITH- | : | |
| TUCKER, all individually and in their official | : | |
| capacities; and BOARD OF EDUCATION OF | : | |
| THE CHRISTINA SCHOOL DISTRICT, | : | |
| | : | |
| Defendants. | : | |

**COMPLAINT**

1.  This is a Fourteenth Amendment procedural due process and state law breach of contract action on behalf of Plaintiff Dr. Daniel C. Shelton, an experienced and decorated Superintendent of the public school Board Defendant.  Plaintiff's mistreatment and termination have been widely followed by taxpayers and legislators as well as extensively covered by the local news media.  For reasons unknown, the Board waived attorney-client privilege and allowed the news media subsequently and independently to publish numerous written warnings from the Board's own attorney that its treatment of the dedicated Dr. Shelton was blatantly unconstitutional, illegal and would result in an award of compensatory and punitive damages against both the Board and certain individual Board members.  But these Defendants chose to disregard those warnings and fired Plaintiff anyway.

2.  Dr. Shelton was terminated:

      (a)     without any notice or meaningful opportunity to be heard;

      (b)     without being given a pre or post termination hearing;

(c)    without disinterested decision makers deciding his fate in the 4-3 termination vote, with the Board's own lawyer repeatedly concluding it was "impossible" for certain Board members to be impartial "[g]iven the[ir] public record of animus" against him which amounted to a "witch hunt;" and

(d)    in violation of the requirement of receiving a "written statement of the reasons for termination" amounting to "good and just cause" and only following the "fair hearing" protections of his five year employment contract and a one year extension of the same.

## I. <u>JURISDICTION</u>

3.  The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), §§ 2201 and 2202, and the Fourteenth Amendment to the United States Constitution. The cause of action arises under 42 U.S.C. § 1983 and the Fourteenth Amendment. The claims arose in this judicial district.

4.  This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

5.  Venue is proper in this judicial district because it is the where Plaintiff was employed and the claims arose.

## II. <u>THE PARTIES</u>

### A.  Plaintiff

6.  Plaintiff Dr. Daniel C. Shelton ("Shelton" or "Plaintiff" ) is a 52 year old White male veteran Delaware public school administrator, with an impeccable employment record, no prior workplace disciplinary record, the recipient of commendations for his outstanding job performance, and a resident of New Castle County, Delaware where he was employed for five years beginning July 1, 2020 as the superintendent of the Christiana School District.

### 1.  Professional Reputation and Recognition.

7.  In April 2022 Plaintiff was voted by his peers Delaware's superintendent of the year receiving the award from the Delaware Association of School Administrators, the state-level affiliate of the American Association of School Administrators ("AASA").  The award is based on leadership for learning, communication, professionalism and community involvement.  Dr. Matthew Burrows, superintendent of the Appoquinimink School District and a member of the national governing board of the AASA, in a prepared statement at that time stated: "he's shown passion and commitment to the students, staff and families of his district and has made deep and lasting contributions to education here in Delaware."

8.  For the 2020-21 school year Plaintiff was president of the Chief School Officers Association of Delaware, while that group navigated the pandemic.

9.  In 2012 he was selected by his peers to be the National Association of Elementary School Principals ("NAESP") "National Distinguished Principal," and he also received the Paul Carlson Award in 2014 which is the highest honor given in the Delaware Association of School Leaders.

10.  During his time as Superintendent Plaintiff served on the Governor's Council of the Arts (the "DDOA" or Delaware Division of the Arts) (2017-present), as Honorary Commander of the Dover Air Force Base (2018), as member of the Dover & Caesar Rodney Rotary Clubs, and as a member of the legislative committee for the Central Delaware Chamber of Commerce.   He also was recognized by the Delaware General Assembly by proclamation for his support of Delaware schools.

## 2.  Education and Employment History.

11.  Plaintiff has several degrees from the University of Delaware including his doctorate in Educational Leadership and Public Policy in 2007, a Masters of Education in Curriculum and

3

Instruction in 2001, and a Bachelors of Science in Health, Physical Education, with a minor in Computer Science, in 1995.

12.  Plaintiff also has at least 26 years of professional education experience.

13.  After receiving his B.A., in 1998 he started his career in the Christina School District, first as a teacher and then as an administrator, before spending five years as the Superintendent of the Capital School District in Dover and then he finally returned to Christina School District as Superintendent in 2020.

14.  Plaintiff has been employed by the Defendant for over 21 years.  In 1998 he began working for the Christina School District as a Technology teacher at Drew-Pyle Intermediate School.  His later positions include Assistant Principal at Jones Elementary, Principal of Maclary Elementary and Smith Elementary School where he served 12 years during which time there were dramatic increases in test scores, fully functioning professional learning communities and a schedule to maximize the effectiveness and staff efficiency in small group instructional time. Kirk Middle School followed as its principal.

15.  In 2015, Plaintiff was selected as the Superintendent of the Capital School District which had a long history of racial tensions and poor performance that had over time eroded the trust of the community.  During five years in Capital, he saw significant gains in test scores and perhaps just as important increases in survey data in trust and appreciation of the work he was doing.

16.  When the pandemic hit he developed immediately a solid plan that got through the remainder of the 2019-2020 school year including solid delivery of instruction, handing out computers, instructional supplies and food for students and ensuring teachers had the training they needed to be successful.

4

17. In 2020 Plaintiff was asked to apply for the open position as the Christina School District Superintendent and was the chosen candidate. Christina had not had success in preparing for a COVID return and he and his team spent the summer preparing, purchasing computers and hot spots and preparing the teachers for a hybrid opening to the school year.

18. The pandemic was a difficult time but it was successfully navigated with the collective bargaining units, with employees and parents.

19. A comprehensive strategic plan was adopted and the student body was engaged in an effective way by organizing a Superintendent's Student Advisory Council which independently voted a member to represent students on the Board of Education.

20. Coming out of the pandemic, the District saw a steady increase in Smarter Balance, SAT and graduation rates with four schools coming out of improvement status. The District also had the highest growth in 10th grade scores and the Christiana Honors Academy had the best Middle School Smarter scores in the State.

**B. Defendants**.

21. Defendant Board of Education of the Christina School District (the "Board") is a reorganized school board operating under 14 Del.C. § 1043. It does business as the Christina School District (the "District"), 1899 South College Avenue, Newark, DE 19702.

22. Under Delaware law, the Board is the final decisionmaker and policymaker for all employment, personnel and contractual decisions involving the Superintendent of the District.

23. For example, it has "the authority to administer and to supervise" and "the authority to determine policy ... for the general administration" of the District. 14 Del.C. § 1043.

24. It also is empowered to "appoint personnel," 14 Del.C. § 1049(a)(9), and "[d]etermine the educational policies of ... and prescribe rules and regulations for the conduct and

management of the" District.  Id. at § 1049(a)(2).

25.  All of its decisions in the employment arena are final.

26.  The employment context is not one of the few areas where the broad authority of a school board is limited by statute.  Compare 14 Del.C. § 1058 (creating a limited power to appeal certain "controversies involving the rules and regulations of [a] school board" to the State Board of Education).

27.  Instead, and specific to the context of due process and contract rights of even lower level district employees, for nearly 50 years the District of Delaware has held that Delaware school boards "possess[ ] considerable autonomy of operation and power of initiative," all "without the necessity of action by the State Board of Education or the General Assembly." Morris v. Bd. of Ed. of Laurel Sch. Dist., 401 F.Supp. 188, 205 (D. Del. 1975); see id. at 204.

28.  Such employment matters fall squarely within the purview of "the local school board ... and not [ ] the State Board of Education or the State of Delaware."  King v. Caesar Rodney Sch. Dist., 396 F.Supp. 423, 426 (D. Del. 1975).

29.  Defendant Donald Patton ("Patton") was elected to the Board in July 2021, reelected in July 2022 and has served as its current President since July of 2023.  He is sued individually and in his official capacity.

30.  His professional history as an educator employed by the District was not distinguished and certain incidents which occurred provide various motives for him to dislike and retaliate against Plaintiff.

31.  Defendant Naveed Baqir ("Baqir") is currently a member of the Board who first took office in July 2021.  He is sued individually and in his official capacity.

32.  Defendant Yun Fei Lou ("Lou") is currently a member of the Board who first took

office in July 2023.  He is sued individually and in his official capacity.

33.  Defendant Althea Smith-Tucker ("Smith-Tucker") is currently a member of the Board who first took office in July 2020.  She is sued individually and in her official capacity.

## II.  FACTS

### A.  The Two Employment Contracts Creating Protected Property Interests.

### 1.  The Original Contract.

34.  Attached as Exhibit A is Plaintiff's four page written State of Delaware School Superintendent Contract dated June 4, 2020, with a term from July 1, 2020 through June 30, 2025, five years, and signed by all seven then current members of the Defendant Board.  The vote to hire Plaintiff was unanimous.

35.  Thereafter on July 1, 2020, during the unprecedented Covid-19 educational lockdowns in Delaware and nationally, under paragraphs 4 and 6, Plaintiff, on the direction of the Defendant Board began exercising duties overseeing nearly 14,000 students, 3,000 teachers, administrators and other employees in a professional manner and in accord with Delaware law.

36.  His duties included: management of all District affairs; responsibility for general administration, instruction, human resources, communications, government relations, facilities and business affairs; recommendations regarding personnel matters; and Executive Secretary to the Board.

37.  Aside from benefits, the annual salary under this contract began at $199,000 per year and with negotiated raises is currently $210,043.

38.  Paragraph 9 of the written contract provides that it cannot be terminated during its term "except for good and just cause," following a previous "fair hearing," and prior to such hearing "a written statement of the reasons for termination" must have been provided.

## 2. The One Year Contract Extension.

39.  On or about December 12, 2023, the Board approved a one year extension of Plaintiff's contract through June 30, 2026.  For the 2025-2026 school year the contractual wage total here is $219,898.

40.  Plaintiff agreed to and accepted this extension.

41.  On January 9, 2024, the Board approved the minutes of their prior Board meeting which included the extension of Plaintiff's contract.

42.  The Board's longtime attorney admitted in writing on March 13, 2024 that this "extension" of Plaintiff's contract "was approved December 12, 2023."

43.  On March 12, 2024, Defendant Lou also publicly admitted that the Board had approved a one year extension of Plaintiff's contract.

## B. Breach of Contract, Adverse Actions and Deprivation of Property Interests.

### 1. Breach.

44.  Defendants thereafter materially breached both of Plaintiff's contracts in numerous ways.

45.  On numerous occasions, by repeated 4-3 Board votes, Defendants took numerous adverse actions (including suspension and termination) against Plaintiff without: (1) any prior "written statement of the reasons;" (2) a prior "fair hearing" to allow Plaintiff to respond and defend himself;' and (3) "good and just cause."

46.  In so doing, Defendants materially breached both of Plaintiff's employment contracts.

47.  For example, by a 4-3 vote at a Board meeting on March 12, 2024, Plaintiff was

suspended and reprimanded without pay effective for three days from April 1, to April 3, 2024. He lost three days of his negotiated wages by this action.

48.   Non-Defendant Board members Douglas Manley, Monica Moriak and Dr. Clair O'Neal strongly opposed the action.

49.   In the public session that day Defendant Patton during debate and in response to Board member Moriak did not deny and in fact admitted that there had been: no discussion with Plaintiff of the alleged reasons for the suspension; no prior notice had been given to him in writing; and no "fair hearing" had been held at which he had any opportunity to respond or rebut the charges against him.

50.   By a 4-3 vote at the same Board meeting on March 12, 2024 the earlier one year extension of Plaintiff's employment contract also was recinded.

51.   Again, no written notice of the reasons was given to Plaintiff; no "fair hearing" was held before doing so; and no "good and just cause" existed to justify this material breach of contract .

52.   Then by a 4-3 vote at a Board meeting on May 24, 2024, as a total surprise and with no prior warning, the Board voted "no confidence" in Plaintiff.

53.   An agenda item to provide a written evaluation of Plaintiff was removed from the agenda for that day.

54.   Again, no written notice of the reasons was given to Plaintiff; no "fair hearing" was held before doing so; and no "good and just cause" existed to justify this.

55.   Because it was May and graduation was upon the Board, Plaintiff was not suspended from his duties after this vote.

56.   On June 26, 2024 the Delaware Department of Justice issued a Finding that the

Board had violated the Freedom of Information Act with this "vote of no confidence." (Ruling at 7, see 3). The Board through its attorney on June 7, 2024 had "conceded" that a violation had occurred by "the Board's failure to notice its vote of no confidence in the superintendent in the May meeting agenda." (Ruling at 2). The DOJ agreed with this admission.

57.   By a 4-3 vote at the following Board meeting on July 9, 2024, Plaintiff was suspended, he was reprimanded, and he was placed on administrative leave. Thereafter he was denied access to his offices and all systems of the District and he was denied supervision of any of its activities or personnel and not allowed to perform any of his prior job duties and responsibilities identified above. His email was turned off, and his office keys were demanded.

58.   Again, no written notice of the reasons for these actions was given to Plaintiff; no "fair hearing" was held before doing so; and no "good and just cause" existed to justify any of this.

59.   By a 4-3 vote at a Board meeting on August 13, 2024 the Board hired a replacement Superintendent and gave him a one year term of office.

60.   As a result, Plaintiff was out of a job.

61.   Again, no written notice of the reasons was given to Plaintiff; no "fair hearing" was held before doing so; and no "good and just cause" existed to justify any of this.

### 2. The Board's Own Lawyer's Admission of the Board's "Wholesale Disregard of the Law" as it Engaged in a "Witch Hunt"

62.   For more than four decades, the Board has been represented by its distinguished, longtime legal counsel at Morris James LLP.

63.   For many years, that distinguished lead counsel has been attorney James H. McMackin, III, Esquire, who has regularly given legal advice to the Board.

64.  But for unknown reasons, during the summer of 2024 the Board waived attorney-client privilege over its communications with its longtime legal counsel.

65.  One of the ways the Board did this was by providing confidential attorney-client e-mails and communications to members of the Delaware media and to the general public.

66.  Numerous news stories were thereafter widely published addressing the contents of these no longer protected communications.

67.  Members of the general public also widely circulated these communications.

68.  These communications contained many evidentiary admissions directly relevant to Plaintiff's lawsuit.

69.  For example, on July 17, 2024 attorney McMackin admitted in writing that Defendant Board members were engaging in a "witch hunt" towards Plaintiff.

70.  He admitted that there was a "mountain" of evidence that the four Board member Defendants were not impartial towards Plaintiff.

71.  He admitted that these same four Defendants had displayed a "public record of animus" towards Plaintiff.

72.  He admitted that "[g]iven public statements and actions, one or more board members ... will have an '**impossible**' hill to climb if they claim to be impartial."

73.  He admitted that this lack of impartiality would result in a constitutional "due process" violation.

74.  He explained to the four individual Defendants that their "lack of impartiality can not only result in district liability, but it is one of the few issues that gives rise to personal liability – even for elected volunteers."

75.  He also repeatedly warned the Board that its illegal actions towards Plaintiffs were

11

going to, by necessity, lead to his resignation.

76.  In accord with the finest traditions of the Delaware Bar, attorney McMackin explained that he would not and could not be a party to the Board's wholesale illegal behavior towards Plaintiff and otherwise.

77.  He explained that the Board's "wholesale disregard of the law" was greatly troubling and illegal.

78.  He explained, "I am not sure what the Board's goal is, but it is not adherence to the law."

79.  Finally, on August 14, 2024, the Board's longtime attorney McMackin and the Board's longtime law firm Morris James, resigned from representing the Board.

**3.  The DOJ's Additional Concern for Board Lawlessness.**

80.  The Delaware Department of Justice, by an epilogue in the Delaware Budget statute, in July 2024 also was required to monitor all Board meetings, including even executive sessions, due to Delaware legislative concerns about the Board's illegal meetings and many other public concern problems.

81.  In July 2024 attorney McMackin had reported to Defendants that the DOJ "mentioned to me that they are considering ways to take action against the District considering public turmoil but they disclosed nothing further."

**D.  Damages.**

**1.  Wages and Benefits**

82.  As a direct and proximate result of the actions of the Defendants as detailed herein, Plaintiff has suffered and will suffer economic damages based on a wage and benefit package of about $292,000 annually through the year 2026, including, but not limited to: loss of wages; loss

12

of earnings; loss of benefits, including COBRA benefits; decreased earning capacity now and upon retirement; decreased employment and earnings opportunities; decreased pension and retirement benefits; and other pecuniary losses.

83. For the 2025-2026 year the base wage loss starts at $219,898 without factoring in 15% for lost benefits. For the next 10 years, up to Plaintiff's retirement at age 62, with a 2% expected annual raise factored in, Plaintiff's wage and benefit loss totals $2,768,994.

**2. Injury to Reputation.**

84. As a direct and proximate result of the actions of the Defendants as detailed herein, Plaintiff's reputation has been destroyed in: (1) the local, regional and national educational communities; and (2) the public at large.

85. Plaintiff is unemployable. After applications, he cannot even obtain an initial interview as an administrator or educator either in Delaware, Pennsylvania or Maryland.

86. His professional reputation has been ruined by the public implication that he is guilty of some type of grievous and immoral wrongdoing which caused the District and individual Defendants to:

- March 12th - suspend and reprimand him and unilaterally cancel his next year's contract;

- May 24th - pass a "no confidence" vote about his professionalism;

- July 9th - permanently suspend, reprimand him and place him on leave; and

- August 13th - hire a replacement superintendent.

87. Defendants made numerous false, misleading and defamatory written and oral statements about Plaintiff.

88. The statements referred to Plaintiff by name.

89. The gist of these statements is that Plaintiff is a racist, a liar, immoral and an inept and incompetent educational administrator who engaged in workplace wrongdoing so severe that it justified two mid-contract firings and the waiver of attorney-client privilege between the Board and its own longtime attorney.

90. For example, on April 21, 2024 on Community Crossfire with Norman Oliver, on DETV (see https://www.youtube.com/live/FPnhsUaJkAQ?si=xsbIS5AA35LwX5jT), during the interview Defendant Patton accused Plaintiff of being a "racist." (Recording at 4:46+).  After falsely stating that Plaintiff had orchestrated a Board effort to remove him as President of the Board, Patton stated "he did it because I am Black."

91. These statements are completely and categorically false.

92. Being called a racist injures a person's reputation in the popular sense, diminishes the esteem, goodwill or confidence in which a person is held, excites adverse, derogatory or unpleasant feelings or opinions against him and exposes him to public hatred, contempt, scorn, obloquy, and shame.  In doing so, it also harms a person's reputation, lowers him in the estimation of the community and deters third persons from associating or dealing with him.

93. The defamatory nature of the statements is self-evident and would be understood as such by any reasonable third party, by the plain words of these statements themselves and also by referring to extrinsic evidence.

94. These statements and integrally related actions also maligned Plaintiff in his profession, trade or business.

95. For example, the above noted actions and statements, in their totality convey the message that Plaintiff engaged in grievous educational and or other wrongdoing at work.

96. They falsely accused Plaintiff of being an inept and incompetent educational

14

administrator.

### 3.  Non-Pecuniary Losses.

97.  As a direct and proximate result of the actions of the Defendants as detailed herein, Plaintiff has also suffered emotional pain, suffering, disappointment, anger, inconvenience, mental anguish, loss of enjoyment of life, mental and physical pain, physical injury, anguish, humiliation, embarrassment, and other non-pecuniary losses and injury. Psychological, emotional or mental injuries include, but are not limited to: depression; anxiety; trouble sleeping; recurring nightmares; decreased energy and motivation; as well as other psychological, emotional and mental injuries.

### E.  ALLEGATIONS REGARDING THE DEFENDANTS' CONDUCT

98.  All the actions of the Defendants described both above and below were taken pursuant to policies, practices and/or customs of the Board and were authorized, sanctioned, implemented, permitted and/or ratified by officials functioning as final decisionmakers at a policymaking level.

99.  By the policies, practices and/or customs of officials functioning as final decisionmakers at a policymaking level, the Board has denied Plaintiff his constitutional rights under the Fourteenth Amendment to the United States Constitution.

100.  The Defendants' actions violated clearly established federal constitutional rights of which any reasonable official would have known.

101.  At all times material hereto the individual defendants participated in, authorized, and sanctioned the federal constitutional deprivations described above.

102.  At all times material hereto the individual defendants and their agents were acting under color of law.  The federal constitutional deprivations described herein are fairly attributable

to the State.

103.  The actions of the Defendants and their agents or employees were deliberately, intentionally, willfully, purposefully, and knowingly done in violation of federal constitutional rights and because of the exercise of those rights.

104.  The individual Defendants either knew or showed a negligent or reckless disregard for the matter of whether their conduct violated federal constitutional rights.

105.  Their actions were outrageous and taken with evil motive, in bad faith, out of personal animus and without any reasonable grounds to support them.

106.  Their actions were wanton and malicious or taken with reckless indifference to federal constitutional rights.

107.  The exercise of rights under the U.S. Constitution made a difference in all actions adverse to Plaintiff.

108.  The exercise of these rights was a motivating, substantial or determinative factor in all actions adverse to Plaintiff.

109.  The Defendants' actions were willful, reckless and oppressive.

110.  The Defendants' actions were motivated by bias, bad faith, and improper motive.

111.  The Defendants' actions constitutes an abuse of governmental power.

112. The individual Defendants did not reasonably believe that the actions they took were necessary to accomplish any legitimate governmental purpose.

113.  The Defendants' actions do not further any narrowly drawn important, substantial or compelling governmental interest.

114.  The Defendants' actions are not so reasonable as to further any governmental interest asserted and do not closely fit the goal of serving those governmental interests.

### COUNT I (Fourteenth Amendment - Procedural Due Process
### - No Process Whatsoever)

115.  Plaintiff repeats and realleges paragraphs 1-114 set out above.

### A.  Property Interests Created by Written Contract.

116.  Plaintiff possessed protected property interests in his employment based on his

written contracts, and from local government laws, policies, customs and practices, both written

and unwritten, and from mutually explicit understandings between his government employer and

its employee.  Stana v. Sch. Dist of City of Pittsburgh, 775 F.2d 122, 126 (3d Cir. 1985).

### B.  The Process Due Was Pre and Post Termination Hearings.

117.  Federal law determines what process is due to Plaintiff.  Cleveland Bd. Of Educ. v.

Loudermill, 470 U.S. 532, 541 (1985).

118.  Plaintiff was denied the root requirement of the opportunity for a hearing before he

was deprived of his employment rights.  Id. at 542.

119.  Plaintiff was denied his right to "notice" of the charges against him.  Id.

120.  The significance of the private interest "in retaining employment cannot be

gainsaid" since Plaintiff's livelihood was at stake as well as his reputation as an educator.  Id. at

543.

121.  Plaintiff also was denied some opportunity to present "his side of the case."  Factual

disputes were involved too.  The need for a discharge was not clear and "the only meaningful

opportunity to invoke the discretion of the decisionmaker is likely to be before the termination

takes effect."  Id.

122.  Allowing Plaintiff to present his full version of the events would have provided "a

meaningful hedge against erroneous action."  Id. at 543 n.8.

17

123.  The governmental interest in an immediate termination of Plaintiff was non-existent, presented no administrative burden nor intolerable delays. No significant hazard was presented by keeping Plaintiff on the job.  Id. at 544-45.

124.  No "extraordinary situation," "emergency situation" or "rare exception" to the requirements of a pre-termination hearing exist.  Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 570 n.7 (1972).  Nor is any "extremely narrow" exception justified.  Stana, 775 F.2d at 127.

125.  Plaintiff "received no hearing, either before or after his [termination], and hence ... he was deprived of due process."  Bradley v. Pittsburgh Bd. of Educ., 913 F.2d 1064, 1078 (3d Cir. 1990).

126.  Because Plaintiff was given none of the long established and constitutionally mandated procedural protections – neither a pre-termination nor a post-termination hearing – our own District's educational and other precedents have long mandated constitutional liability for such procedural due process violations.  See, e.g. Hawkins v. Bd. of Public Educ., 468 F.Supp 201, 208-14 (D.Del. 1973); Pitts v. Key, 511 F.Supp. 497, 501-05 (D.Del. 1981).  The result is the same under Third Circuit precedent. See, e.g. Bradley, 913 F.2d at 1078 ("Bradley received no hearing, either before or after his suspension, and hence ... he was deprived of due process.").

127.  There is a direct causal relationship between Defendants' actions and the harm Plaintiff suffered.

128.  Defendants' actions were the "but for" cause of the termination of Plaintiff and other actions taken against him.

129.  As a direct and proximate result of defendants' actions, Plaintiff has been injured.

130.  Plaintiff's constitutional right to procedural due process has been denied under the

Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

**COUNT II (Fourteenth Amendment - Procedural Due Process
- Biased Decisionmaker)**

131.  Plaintiff repeats and realleges paragraphs 1-130 set out above.

132.  Due process requires an impartial decisionmaker - one who is neutral, detached and lacks bias - before a person may be deprived of a property interest by that decisionmaker.

133.  Due process also requires that a decisionmaker must recuse themselves even in the absence of actual bias, if that decisionmaker's impartiality may be "reasonably" questioned.

134.  The individual Defendants were actually biased against Plaintiff and were not impartial decision makers in deciding all of the matters set forth above.

135.  Defendants' own longtime distinguished attorney, widely known for his wisdom, ethics and zealous advocacy on behalf of his clients, nevertheless concluded that the individual Defendants, his own clients: (1) actually were not impartial decision makers; and (2) also that their impartiality could reasonably be questioned in light of their past words and actions.

136.  All four of the individual Defendants lacked impartiality and had actual bias against Plaintiff.

137.  All of the votes to breach Plaintiff's contracts, suspend him and the rest of the actions set forth above passed by the narrowest of margins of four votes in favor and three opposed.

138.  All four of those votes in favor of taking actions against Plaintiff were tainted by actual bias and impartiality in violation of the Fourteenth Amendment.

139.  All four of those votes were tainted by the appearance of actual bias and impartiality that would be questioned by a reasonable person.

140.  If only one of those four Defendants voting against Plaintiff had recused themselves because of their impartiality, actual bias and the reasonable appearance of the same, none of the actions challenged by Plaintiff in this lawsuit could have been taken against him and would not have passed the vote by the Board.

141.  Instead, the vote would have been tied 3-3, leaving the Board unable to change the status quo by firing Plaintiff, breaching either of his employment contracts, and/or suspending and later firing  him.

142.  If all of the individual Defendants who lacked impartiality and bias had recused themselves, the votes would have failed 0-3 and no actions could have been taken against Plaintiff.

143.  There is a direct causal relationship between Defendants' actions and the harm Plaintiff suffered.

144.  Defendants' actions were the "but for" cause of the termination of Plaintiff and other actions taken against him.

145.  As a direct and proximate result of defendants' actions, Plaintiff has been injured.

146.  Plaintiff's constitutional right to procedural due process has been denied under the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983.

**COUNT III (State Law - Breach of Original Contract)**

147.  Plaintiff repeats and realleges paragraphs 1-146 set out above.

148.  Plaintiff had a five year employment contract with the Board.  It is attached as Exhibit A.

149.  The Board breached multiple terms of that contract.

150.  Plaintiff has suffered injury.

151. There is a direct causal relationship between Defendants' actions and the harm Plaintiff suffered.

152. Defendants' actions were the "but for" cause of the breaches of the contract.

153. As a direct and proximate result of defendants' actions, Plaintiff has been injured.

154. Plaintiff's right to be free of breach of contract has been denied under the common law of the state of Delaware.

## COUNT IV (State Law - Breach of Extended Contract)

155. Plaintiff repeats and realleges paragraphs 1-154 set out above.

156. Plaintiff had a single year extension of his employment contract with the Board.

157. The Board breached multiple terms of that contract.

158. Plaintiff has suffered injury.

159. There is a direct causal relationship between Defendants' actions and the harm Plaintiff suffered.

160. Defendants' actions were the "but for" cause of the breaches of the contract.

161. As a direct and proximate result of defendants' actions, Plaintiff has been injured.

162. Plaintiff's right to be free of breach of contract has been denied under the common law of the state of Delaware.

**Wherefore**, Plaintiff prays that the Court:

A.     Enter judgment against the Defendants, jointly and severally.

B.     Enter a declaratory judgment declaring the acts of the Defendants to be a violation of Plaintiffs' constitutional and statutory rights under State and federal law.

C.     Enter a judgment against the Defendants for compensatory damages, including lost wages, back pay, pension and other benefits, for future or front pay, loss of earning capacity, emotional distress, humiliation,

embarrassment, and injury to reputation which has made Plaintiff unemployable.

D.      Enter separate judgment against the individual Defendants for punitive damages.

E.      Issue a permanent injunction requiring Defendants to expunge Plaintiff's personnel files of any derogatory, false, or misleading information relating to this matter.

F.      Award damages in an amount to be determined at trial for lost back pay and front pay including all incremental pay increases that Plaintiff would have received and his wage and benefit losses until his retirement at age 62.

G.      Award damages for lost 401(k) matching funds.

H.      Award damages for lost medical, dental, vision, and life insurance and other lost benefits.

I.      Award compensatory damages for out-of-pocket medical expenses.

J.      Issue a reparative injunction directing that each of the individual capacity defendants write a letter of apology to Plaintiff, apologizing for their illegal violations of Plaintiff's constitutional and common law rights.

K.      Award Plaintiff attorneys' fees, costs and pre and post judgment interest for this action.

L.      Require such other and further relief as the Court deems just and proper under the circumstances.

Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQUIRE (#243)**
**STEPHEN J. NEUBERGER, ESQUIRE (#4440)**
17 Harlech Drive
Wilmington, DE 19807
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: December 9, 2024        Attorneys for Plaintiff